**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ______________

DETROIT STREET PARTNERS, INC.,

Plaintiff,

v.

TRIAD SECURITIES CORPORATION,

Defendant.

---

**VERIFIED COMPLAINT AND JURY DEMAND**

---

Plaintiff Detroit Street Partners, Inc. ("Detroit Street" or "Plaintiff"), by its undersigned attorneys, brings this Complaint against defendant Triad Securities Corporation ("Triad" or "Defendant") and alleges as follows:

## NATURE OF THE ACTION[1]

1. This case concerns a massive unlawful conspiracy between and among Triad and certain of its brokerage customers (collectively, the "Co-Conspirators"), who repeatedly and knowingly engaged in mail fraud, wire fraud, securities fraud, and money laundering over an extended period of time. On information and belief, the conspiracy continues to the present day.

2. Certain brokerage firms, such as J.P. Morgan, grant valuable IPO Allocations—which are limited shares of newly issued stock offered at IPO price before trading begins on the open market—to customers depending on the amount of brokerage commission revenue those customers generate. To compete for IPO Allocations, and to increase their commission revenues,

[1] Capitalized terms used in this section shall have the meanings ascribed to them in the body of the Complaint unless otherwise defined.

numerous Co-Conspirators exploited this system by opening brokerage accounts based on false information to enable them to obtain, by fraudulent means, allocations of valuable IPO shares to the detriment of individuals competing for such shares, including Detroit Street, through legitimate trading activity and means with legitimate brokerage accounts. The Co-Conspirators systematically executed high volumes of "wash" trades in which they bought and sold the same security in rapid succession at approximately the same price and paid exorbitant and/or non-customary commissions on those trades in order to be eligible to receive valuable IPO Allocations. These wash trades lacked any material economic substance. Instead, they were designed solely to generate commissions that would result in greater allocations of IPO shares for the Co-Conspirators doing the wash trades. The wash trades were knowingly facilitated by Triad, which cleared all of the trades for their brokerage customers and, therefore, was able to see both the purchase and sale of the securities at issue in the wash trades.

3. Detroit Street suspected Triad was a key and knowing participant in a scheme in which traders conducted wash trades to acquire IPO shares, causing harm to Detroit Street. As a result, Detroit Street accused Triad of participating in the scheme in a FINRA complaint filed in June 2022. It was not until February 17, 2023, after aggressive attempts to get discovery in that FINRA proceeding concerning the method by which fraudulent traders executed the wash trades, that Detroit Street obtained documents incontrovertibly showing with particularity how Triad had enabled its Co-Conspirators by covering up their wash trades. The Co-Conspirators enlisted Triad as a prime broker to clear their security trades with other brokerage firms such as J.P. Morgan, so that these firms could not see both sides of what were clearly wash trades and, thus, would not be alerted to the wash trading activity. At the time the FINRA complaint was filed in June 2022, there was no other obvious way for the fraudulent traders to accomplish their racketeering scheme

to obtain IPO shares. It became apparent that brokerage firms like JP Morgan were only handling one side of each such wash trade, and apparently did not see the other side of such illegal trades.

4. The Co-Conspirators paid Triad a fee to clear wash trades done at brokerage firms and to look the other way. Triad cleared all the trades (that is, it processed payments and delivered securities and commissions to other brokerage firms), so it knew that wash trading was occurring, and it knew or should have known that commissions were abnormal and that the Co-Conspirators were needlessly paying excessive commissions on obvious wash trading. After examining the records produced by Triad beginning in February 2023, there was no other logical conclusion to be gleaned from the records, other than Triad's Co-Conspirator customers obtaining IPO Allocations which Triad also cleared. These wash trades violated rules promulgated by FINRA and Triad's own policies and procedures, but because Triad generated so much money facilitating this illegal activity, Triad ignored the illegal activity to reap the millions of dollars in commission revenue and fees.

5. Records produced for the first time on February 17, 2023, explicitly show details of the actions of Triad and the Co-Conspirators engaging in massive volumes of wash trades. It is undisputed that all events leading to this activity were initiated by the Co-Conspirators and facilitated by Triad. These actions were necessarily conducted over the wires within the meaning of wire fraud under the Colorado Organized Crime Control Act ("COCCA"), clearly constituting an enterprise as defined by COCCA. Furthermore, all parties involved engaged in fraudulent activities for their own financial gain. As a result of this illegal scheme, legitimate clients at other brokerage firms, including Detroit Street, who were entitled to IPO shares—either on their own behalf or, in the case of Detroit Street, also on behalf of clients for whom they served as investment advisors—were deprived of their proper allocation. This deprivation occurred

because the illegally awarded IPO shares reduced the number of shares available for legitimate customers. Additionally, they almost certainly paid a premium for their legitimate IPO allocations due to the inflated cost of the allocated IPO shares.

6. Consequently, Detroit Street lost a large sum of money and was damaged by the illegal activity of Triad and its Co-Conspirators over many years, both as traders and as investment advisors. Their rightful allocations were effectively stolen by the Co-Conspirators with Triad's knowledge and assistance, enriching the Co-Conspirators at the direct expense of Detroit Street and other similarly situated innocent traders. Triad, unlike other brokerage firms, was willing to be a Co-Conspirator with the traders to generate large commissions through facilitating the wash trades so that its Co-Conspirators could deprive legitimate traders of whatever amount of IPO shares the Co-Conspirator traders were awarded for their illegal commissions. As a result, Detroit Street's share of these illegally obtained IPO Allocations was stolen, and the shares it did receive were inflated in price due to the Triad-Co-Conspirator scheme. Unlike the easily calculable commissions and fees Triad received, the inflated price of the IPO allocated shares will need to be determined by experts at trial. Because Detroit Street was undeniably harmed, it has standing under COCCA to seek full disgorgement of Triad's ill-gotten gains. Through this action, Detroit Street demands such disgorgement, including for all acts that allow it to reach back to the initial point of injury and as long as Triad has actively conspired with both known and unknown Co-Conspirators in the scheme described above.

**PARTIES**

7. Plaintiff Detroit Street Partners, Inc. (defined above as Detroit Street) is a corporation with its principal place of business at 6161 South Syracuse Way, Greenwood Village, Colorado. Detroit Street is a securities trader that opened brokerage accounts at multiple well

known investment banks, and for the Family Office of Dave Berlin, for the purpose of engaging in securities transactions. Detroit Street conducted securities trades between 2013 and 2022. It also managed assets as a private fund advisor for one client, and one client only (one of the wealthiest Family Offices in the world) from 2017-2022. That client was also affected by this fraud and Detroit Street, as a private fund advisor, lost a percentage of the money the client lost since it worked exclusively for a percentage of that client's profits.

8. Defendant Triad Securities Corporation (defined above as Triad) is a New York corporation with its principal place of business at 111 Broadway, 11th Floor New York, New York 10006.

9. "Co-Conspirators" refers to individuals and entities who agreed to conspire between and among each other to accomplish, and performed affirmative acts in furtherance of, the COCCA conspiracy alleged herein.

## JURISDICTION AND VENUE

10. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

11. Personal jurisdiction over Triad exists because it has sufficient minimum contacts with this Court as a result of business conducted in the state of Colorado and in the District of Colorado. Triad engaged in substantial business dealings, amounting to millions of dollars, with Co-Conspirators who were citizens of Colorado. Triad's illegal activities, in collaboration with these Colorado Co-Conspirators, caused harm to Colorado citizens. Furthermore, Triad utilized interstate wire transfers and illegal communications, knowing they either originated in Colorado

or were sent from New York to Colorado solely for the purpose of generating profits across state lines.

12. Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Detroit Street resides in this district, the acts complained of originated in this district, and Detroit Street suffered harm from these illegal acts in this District.

## ALLEGATIONS

### A. The IPO Market.

13. An initial public offering of stock (an "IPO") is a method of raising capital for the company issuing the stock (the "Issuing Company"). As part of the IPO process, the Issuing Company retains one or more investment banks to "underwrite" the IPO, *i.e.*, guarantee the sale of a specified number of shares of stock on specified terms and conditions. As part of its consideration for underwriting an IPO, the underwriting bank typically receives the right to offer a specified number of shares to potential purchasers of its choosing at the initial offering price (a so-called "IPO Allocation").

14. The initial offering price of IPO shares is set by the Issuing Company and the underwriter(s) based on, among other things, the anticipated market demand for those shares. Once issued, the price of IPO shares is a function of the actual market demand for those shares. As a general rule, IPO shares trade on the market at prices significantly higher than their initial offering price. As a result, investors who purchase IPO shares at the initial offering price often make an immediate and substantial profit by selling those shares at a higher post-IPO price. IPO Allocations are therefore valuable and underwriting banks generally offer access to its IPO Allocations to significant customers, such as those who generate large commissions for the underwriting investment bank such as JP Morgan, and other favored entities.

**B. The IPO Market Manipulation Scheme.**

15. Triad Securities is a prime broker. As a prime broker, Triad clears all of its clients' trades for them. They also do multiple levels of KYC ("know your customer") reviews, as any other brokerage firm would do. Through known failures that will be proven through discovery in this matter, Triad damaged Detroit Street and other similarly situated honest traders who take all IPO Allocations that investment banks are willing to give them. In this particular case, Detroit Street was deprived of its pro-rata share of IPO Allocations that the investment banks would have granted, which instead went to illegal traders. This occurred due to the assistance of their Co-Conspirator, Triad, which facilitated illegal wash trades to generate illegal commissions, allowing those traders to obtain IPO Allocations they would otherwise not have been entitled to receive. Detroit Street also paid a premium for the inflated cost of the IPO allocated shares.

16. Triad incentivized clients to generate commissions through illegal wash trades and facilitated those trades in a manner that prevented investment banks from detecting their illegitimate nature when allocating IPO shares based on commission volume.

17. On actual knowledge based on discovery received in the FINRA litigation referred to above, Triad was complicit in this illegal conspiracy as of 2022 and, on information and belief, was illegally conspiring and committing predicate acts under COCCA for many years before then, and likely before 2012.

18. Detroit Street, from as early as 2012, has seen its profits from IPO Allocations decrease steadily. The decrease is directly tied to Triad and other Co-Conspirators' illegal actions generating greater commissions through illegitimate wash trading. Detroit Street also found itself unknowingly, though based on information and belief, competing against an increasing number of illegitimate accounts that were continually being added to Triad's client roster. These accounts

should never have been investment bank clients, as they existed solely to pay commission in exchange for IPO shares. Triad knew or should have known this but nevertheless facilitated the illegal wash trades so they could reap the financial benefits. This, in turn, allowed the Co-Conspirators to receive valuable IPO Allocations they were otherwise not entitled to , while Triad cleared all of those IPO Allocation transactions.

19. From approximately 2012-2022, Detroit Street was harmed by this IPO market manipulation scheme (the "IPO Market Manipulation Scheme") in two significant ways: (i) Detroit Street lost valuable IPO shares that it should have been able to purchase but for the IPO Market Manipulation Scheme, and (ii) it artificially drove up the true cost of those IPO shares that Detroit Street was able to purchase by artificially inflating the amount of commissions that it had to generate to receive such IPO Allocations. This increase in commissions resulted from competition against illegitimate accounts that Triad knew or should have known existed solely to obtain IPO shares, as there was no other legitimate reason for its Co-Conspirators to generate such high commissions on trades that had no intrinsic value.

**C. The Co-Conspirators Engage in Wash Trades To Increase Their IPO Allocations.**

20. The Co-Conspirators engaged in wash trade securities transactions to attain top-tier client status at brokerage firms, thereby securing increasingly valuable IPO allocations at the expense of Detroit Street and other innocent brokerage firm customers.

21. Co-Conspirators' wash trading enabled Triad to generate far higher commissions than it would have been entitled to if it had only allowed legitimate trading with legitimate accounts. Indeed, because the wash trades occurred only to enable the Co-Conspirators to obtain IPO Allocations, Triad never would have received the commission revenue resulting from these trades.

22. Triad drove up the cost for Detroit Street to acquire IPO shares from brokerage firms. By knowingly allowing Co-Conspirators to cause an artificial increase in the number of accounts with which Detroit Street competed to become a top-tier client of brokerage firms, Detroit Street would have to increase its legitimate trading activity to generate up to five times higher commissions to maintain its pro rata allocations. Thus, by permitting Co-Conspirators to engage in wash trading, Triad inflated the price of the IPO shares measured by the price of commissions that Detroit Street and other innocent brokerage firms' clients had to generate to be considered top-tier clients and to receive an IPO Allocation.

23. On information and belief, Co-Conspirators of Triad made intentionally false statements about its total net worth to satisfy the suitability requirements that were supposed to be imposed by investment banks and Triad, but Triad ignored warning signs of such illegal behavior so it could open all accounts possible to allow them to do wash trades and line Triad's pockets with fees and commissions.

24. Each trading Co-Conspirator had to submit (by mail, email, or fax) a suitability form—and accordingly necessarily made these misrepresentations—each time they opened an account at Triad. Triad knew or recklessly disregarded the fact that these individuals or entities were making misrepresentations and that the misrepresentations were made solely to enable them to trade to generate excessive commissions and obtain quid pro quo IPO Allocations, and Triad certainly knew that many of its clients were doing illegal wash trades for the sole purpose of generating commissions so they could get IPO Allocations to which they were otherwise not entitled.

25. Each Co-Conspirator generated substantial commissions for brokerage firms through their wash trading, which is clear from Triads records, and in turn received IPO Allocations, which they purchased and then typically quickly sold at a substantial profit.

26. Upon information and belief, excessive IPO Allocations were granted to trader Co-Conspirators, including the Facebook IPO in May 2012, the Alibaba IPO in September 2014, the Snapchat IPO in March 2017, and DoorDash IPO in December 2020, among others.

27. Trader Co-Conspirators used the profits generated from the sale of the IPO shares to continue operating the enterprise with Triad for the purpose of generating more commissions and obtaining more IPO Allocations.

28. This vast and unlawful scheme to manipulate the market for IPO shares in this way directly caused millions of dollars of damages to Detroit Street and other honest traders.

29. In the months leading up to the Snapchat IPO on March 2, 2017, AMN Investments LTD ("AMN"), an entity run by Brian Frenkel, engaged in numerous wash trades partially through J.P. Morgan in order to receive IPO Allocations from J.P. Morgan. Both sides of these wash trades cleared at Triad. The following table reflects some of those wash trades:

| Date | Security | Ticker | Buy/Sell | Quantity Shares | Price | Commission | Broker |
|---|---|---|---|---|---|---|---|
| **February 1, 2017** | Sirius XM Holdings | SIRI | Buy | 150,000 | $4.7500 | **$9,000** | - |
| **February 1, 2017** | Sirius XM Holdings | SIRI | Sell | 150,000 | $4.7409 | **$15,000** | JP Morgan |
| **February 3, 2017** | Nokia Corp | NOK | Buy | 65,000 | $4.8263 | **$6,500** | JP Morgan |
| **February 3, 2017** | Nokia Corp | NOK | Sell | 65,000 | $4.8200 | **$500** | - |
| **February 8, 2017** | Select Sector SPDR | XLF | Buy | 50,000 | $23.3600 | **$5,000** | JP Morgan |
| **February 8, 2017** | Select Sector SPDR | XLF | Sell | 50,000 | $23.3600 | **$3,000** | - |

| Date | Security | Ticker | Buy/Sell | Quantity Shares | Price | Commission | Broker |
|---|---|---|---|---|---|---|---|
| **February 14, 2017** | Advanced Micro Devices | AMD | Buy | 75,000 | $13.4284 | **$7,500** | JP Morgan |
| **February 14, 2017** | Advanced Micro Devices | AMD | Sell | 75,000 | $13.4236 | **$4,500** | - |
| **February 14, 2017** | United States Oil | USO | Buy | 75,000 | $11.4400 | **$4,500** | - |
| **February 14, 2017** | United States Oil | USO | Sell | 75,000 | $11.4300 | **$7,500** | JP Morgan |
| **February 22, 2017** | Nokia Corp | NOK | Buy | 150,000 | $5.0809 | **$15,000** | JP Morgan |
| **February 22, 2017** | Nokia Corp | NOK | Sell | 150,000 | $5.0712 | **$9,000** | - |
| **Total J.P. Morgan Commissions** | | | | | | **$56,500** | JP Morgan |

30. AMN was rewarded handsomely and received 16,500 Snapchat IPO shares from J.P. Morgan. AMN bought the Snapchat IPO shares at $17 per share and sold them for $23 per share, for a one-day profit of $115,500. All trades, including wash trades and IPO trades, cleared through Triad.

31. In the month leading up to the C3.ai and DoorDash IPOs on December 9, 2020, AMN engaged in numerous wash trades with one side going through J.P. Morgan in order to receive IPO Allocations from J.P. Morgan. All of these trades, including wash trades and IPO Allocation trades, cleared at Triad. The following table reflects some of those wash trades:

| Date | Security | Ticker | Buy/Sell | Quantity Shares | Price | Commission | Broker |
|---|---|---|---|---|---|---|---|
| **November 5, 2020** | Ford Motor | F | Buy | 200,000 | $7.9550 | **$10,000** | JP Morgan |
| **November 5, 2020** | Ford Motor | F | Sell | 100,000 | $7.9650 | **$10,000** | - |
| **November 5, 2020** | Ford Motor | F | Sell | 100,000 | $7.9612 | **$500** | Triad |
| **November 5, 2020** | General Electric | GE | Buy | 200,000 | $8.0002 | **$10,000** | JP Morgan |
| **November 5, 2020** | General Electric | GE | Sell | 200,000 | $8.0000 | **$1,000** | Triad |
| **November 6, 2020** | Nokia Corp | NOK | Buy | 200,000 | $3.5216 | **$10,000** | JP Morgan |
| **November 6, 2020** | Nokia Corp | NOK | Sell | 200,000 | $3.5221 | **$1,000** | Triad |

| Date | Security | Ticker | Buy/Sell | Quantity Shares | Price | Commission | Broker |
|---|---|---|---|---|---|---|---|
| **November 9, 2020** | Ford Motor | F | Buy | 200,000 | $8.3650 | **$10,000** | JP Morgan |
| **November 9, 2020** | Ford Motor | F | Sell | 200,000 | $8.3655 | **$1,000** | Triad |
| **November 9, 2020** | Nokia Corp | NOK | Buy | 200,000 | $3.6897 | **$10,000** | JP Morgan |
| **November 9, 2020** | Nokia Corp | NOK | Sell | 100,000 | $3.6900 | **$10,000** | - |
| **November 9, 2020** | Nokia Corp | NOK | Sell | 100,000 | $3.6900 | **$500** | Triad |
| **November 12, 2020** | Ford Motor | F | Buy | 200,000 | $8.1700 | **$10,000** | JP Morgan |
| **November 12, 2020** | Ford Motor | F | Sell | 200,000 | $8.1614 | **$1,000** | Triad |
| **Total Commissions** | | | | | | **$60,000** | **JP Morgan** |
| | | | | | | **$5,000** | Triad |
| | | | | | | **$20,000** | Other |

32. AMN was rewarded handsomely and received 3,500 C3.ai IPO shares. AMN bought the C3a.ai IPO shares at $42 per share, and sold them for $100 per share, for a one-day profit of $203,000. AMN also received 10,000 Doordash IPO shares from J.P. Morgan at $102/share and sold them at $182/share for a one-day profit of $800,000. Between the two IPOs, on December 9, 2020, AMN made over $1 million dollars in profit and such profit was only made possible by the Triad being a Co-Conspirator facilitating the wash trades that induced illegal IPO Allocation.

## D. <u>Triad's Role In The COCCA Enterprise</u>.

33. Certain trader Co-Conspirators, on information and belief, sent in new wash trade traders to Triad to open new accounts, and Triad knew or should have known through minimal due diligence that these were traders associated with its existing Co-Conspirators. Nevertheless, the accounts were opened, thereby creating more and more accounts between Triad and new trader Co-Conspirators to help traders obtain IPO Allocations and Triad to reap the financial rewards of the conspiracy.

34. Triad required each new Co-Conspirator to complete a FINRA "suitability" form, and additional forms which requested information regarding annual income, liquid net worth, total net worth, and the approximate value of investable assets.

35. On information and belief, many Co-Conspirators falsely represented in writing, using interstate mail and/or interstate wires, including email and fax, that: (i) each the Co-Conspirator's net worth was higher than it actually was; (ii) the funds Co-Conspirators used to conduct trades, pay commissions, and purchase IPO shares came from sources other than the Co-Conspirators personal or family wealth; and (iii) no "restricted person" had a beneficial interest in the profits from the IPO Allocations. Triad knew or should have known that there were connections between its trader Co-Conspirators such that certain Co-Conspirators had an undisclosed beneficial interest in the profits from the IPO Allocations. However, for purposes of these allegations and COCCA remedies, it is not necessary for Triad to have known all the inner workings of the relationships among the trader Co-Conspirators. It was plainly evident to Triad that it was conducting business with a large number of individuals and entities who became trader Co-Conspirators in the exact same manner. Triad undoubtedly made the deliberate decision to conspire with each trader and quite possibly also chose to facilitate illegal wash trades for a large network of Co-Conspirators, solely to enable them to obtain IPO allocations, either collectively or individually.

36. Triad, on information and belief, but not as a necessary component of the claims made herein, knowingly breached "suitability" and "know your client" rules and standards so its ultimate Co-Conspirators could open accounts they otherwise would not be able to open.

37. Triad knew that the Co-Conspirators wanted IPO Allocations and could pay significant commissions, so Triad allowed them to open accounts in violation of FINRA and

Triad's suitability requirements. Thus, Triad's willful lack of oversight enabled the Co-Conspirators to fraudulently obtain the opportunity to generate trade commissions and receive IPO Allocations.

38. On information and belief, the trading activity of the Co-Conspirators followed the same pattern. After a new account was opened, the Co-Conspirators would start wash trading and would receive IPO Allocations after generating a certain amount of brokerage commissions from the brokerage firms. This conspiracy between Triad and its wash trader clients, in turn, reduced the IPO Allocations for legitimate accounts like those of Detroit Street.

**E. <u>Triad's Continued Role In The COCCA Enterprise</u>.**

39. The Co-Conspirators knew that placing both sides of the wash trades through one brokerage firm would be too obvious. The resulting regulatory and compliance scrutiny from processing trades through one brokerage firm would have doomed the conspiracy from the start.

40. To conceal the conspiracy, the Co-Conspirators placed each side of a wash trade through different brokerage firms, ensuring that only Triad had full visibility into all the wash trades. Triad was complicit in preventing regulators from easily uncovering the scheme. As a central cog in the operation, Triad processed all sides of the trades.

41. To facilitate this, the Co-Conspirators opened brokerage accounts at Triad, and other brokerage firms. Triad ignored its obligations to conduct suitability and other "know your customer" research into its Co-Conspirators.

42. The Co-Conspirators instructed Triad to clear their trades through the brokerage firms. As a result, the Co-Conspirators paid commissions and fees for the wash trades, and Triad charged the Co-Conspirators fees for both the buy and sell sides of the trades which it knew were

wash trades. The Co-Conspirators used Triad to clear the wash trades because this added layer of clearing was necessary to cover up the scheme from brokerage firms and regulators.

43. Triad knew that the Co-Conspirators were using Triad as a façade to disguise the wash trades. Triad knew that they were receiving IPO Allocations because they also cleared those IPO Allocations.

44. The wash trades placed by the Co-Conspirators would happen in quick succession—the Co-Conspirators would purchase shares of highly liquid securities with one brokerage firm, and then almost immediately sell them with another brokerage firm. At the end of the day, these trades were reported to Triad for clearing, where the Co-Conspirators exchanged money and securities with other brokerages, using Triad as the intermediary.

45. Moreover, Triad performed clearing and prime broker services, which involved the payment of the proceeds of the trade to counterparties, along with the commissions payable to the brokerage firms. Each trader Co-Conspirator would purchase stock from one brokerage—J.P. Morgan, for example. Triad would then deliver funds (including commission) to the brokerage firms thereby helping facilitate paying obviously exorbitant commissions which enabled its Co-Conspirator clients to get IPO Allocations from the brokerage firms Triad paid. The brokerage would deliver the stock to the Co-Conspirator Triad account. The Co-Conspirator would then sell the stocks through another brokerage—Goldman Sachs, for example. Triad would deliver the shares and commission to that brokerage, and the bank would deposit the proceeds of the sale into the Co-Conspirators' Triad account.

46. Thus, Triad knew about the wash trades and the excessive commissions, but still facilitated clearing those trades, and knowingly enabled the violation of the FINRA rules described herein.

47. By turning a blind eye as the Co-Conspirators used Triad as a platform for its illicit wash trades, Triad received millions of dollars of additional commissions and transaction fees. In essence, Triad engaged in a quid pro quo with the trader Co-Conspirators, accepting commissions and fees in exchange for enabling the scheme. Triad, on information and belief, frequently observed multiple Co-Conspirators executing wash trades in the same stocks on the same day.

**F. <u>FINRA Rules Bar Wash Trades</u>**

48. Triad is a member of FINRA and, at all relevant times, was bound by its rules. Upon information and belief, Triad's internal rules and procedures obligated its employees to abide by FINRA rules.

49. FINRA Rule 3151(a), entitled "Quid Pro Quo Allocations," bars any practice for which a member allocates IPO shares in exchange for "compensation that is excessive in relation to the services provided by the member."

50. According to the Guidance for FINRA Rule 3151, "trading activity that serves no economic purpose other than to generate compensation for the member" is per se excessive.

51. Accordingly, the quid pro quo exchange of commissions from wash trades in exchange for IPO shares violates FINRA Rule 3151.

52. The vast majority of the IPO share allocations received by the Co-Conspirators and cleared by Triad for the Co-Conspirators, resulted from commissions paid from wash trades in violation of FINRA Rule 3151.

53. Section 9.7.5 of Triad's employee handbook addresses wash transactions, reading: "Transactions between two accounts with no market risk and where there is no beneficial change in ownership may be considered a 'wash sale.' Customers sometimes request cross

transactions for tax purposes between accounts with the same owner. Such transactions may violate rules and tax losses may be disallowed by the IRS. There should be no pre-arrangement or guarantee of execution price for both sides of the transaction where there is no change in beneficial ownership. All such transactions should be executed at the risk of the market."

54. Additionally, Section 9.7.12 prohibits "Simultaneous Buy and Sell Orders," including "near buy and sell orders in contravention of SEC Rules."

55. Triad violated the employee manual and became a knowing enabler and participant in Co-Conspirators' illicit wash sales.

56. Triad knew these excessive commissions were paid solely to generate commissions to the brokerage firms to receive IPO Allocations. Triad had economic incentives to disregard this fraud by failing to enforce FINRA rules, along with Triad's own policies and procedures, and actively participated in such fraud for economic gain.

## FIRST CAUSE OF ACTION
**Colorado Organized Crime Control Act (COCCA)**
**C.R.S. 18-17-104(3) and 18-17-106**

57. All allegations previously stated herein are incorporated by reference.

58. Triad associated in fact with the other Co-Conspirators to create the enterprise, which they operated for the purpose of generating commissions for Triad and brokerage firms by allowing Co-Conspirators to submit false statements and engage in wash sales.

59. Upon information and belief, Triad and its Co-Conspirators used mail and or the wires crossing interstate lines, to submit forms to process payments, and to enable other integral parts of the conspiracy. Triad knowingly conducted, and participated in conducting, the enterprise through the repeated commission of acts constituting "racketeering activity" under C.R.S. 18-17-103(5), including, without limitation, conduct indictable under 18 U.S.C. §1341

(mail fraud), 18 U.S.C. § 1343 (wire fraud) and/or 18 U.S.C. § 1956 (laundering of monetary instruments), and illicit quid pro quo under FINRA Rule 5131. On information and belief, Triad's conduct is ongoing and Detroit Street demands disgorgement of all of Triad's ill-gotten gains for as far back as the statute allows and up until the illicit activity ceases.

60. Triad violated C.R.S. 18-17-104(3) because it was associated with the enterprise and knowingly participated in the enterprise through a pattern of racketeering activity. Triad's conduct, on information and belief, is ongoing.

61. Triad participated in two or more acts of committing and/or conspiring to commit violations of state statutes that constitute racketeering activity pursuant to C.R.S. 18-17-103—104, which include, but are not limited to, violations of: C.R.S. 11-51-501(1)(a) (knowing participation in a device, scheme or artifice to defraud in connection with the offer, sale, or purchase of securities; C.R.S. 11-51-501(1)(c) (knowing participation in acts, practices, and a course of business which operated as a fraud or deceit upon other persons in connection with the offer, sale, or purchase of securities). On information and belief, Triad's conduct is ongoing.

62. The enterprise was an association in fact among Triad and its Co-Conspirators, the purpose of which was a quid pro quo scheme to generate trading commissions and fees for Triad through wash sales and commissions from those wash sales to brokers so as to obtain IPO shares for the trader Co-Conspirators, which were purchased and then typically quickly sold for profits, all of which also cleared through Triad.

63. The pattern of racketeering activity consisted of Triad's and its Co-Conspirators' repeated and ongoing violations of 18 U.S.C. §§ 1341, 1343, and 1956 through the IPO Market Manipulation Scheme.

64. Each of the aforementioned acts relates directly to the conduct of the enterprise and was carried out in the conduct of the enterprise's affairs. Accordingly, the aforementioned acts constitute a pattern of racketeering activity as that term is defined in C.R.S. 18-17103(3).

65. Plaintiff Detroit Street is an entity that has been injured by reason of Triad's violations of the provisions of C.R.S. 18-17-104(3).

66. Under C.R.S. 18-17-106(7), Detroit Street has a cause of action for threefold the actual damages they have sustained, attorneys' fees, and a right to demand forfeiture of ill-gotten gain from the conspiracy or the proceeds derived therefrom, which they hereby demand.

67. Triad has received millions of dollars of proceeds derived from its violations of C.R.S. 18-17-104(3) which is subject to forfeiture under C.R.S. 18-17-106(10). Under C.R.S. 18-17-106(7)(b), Detroit Street is an injured person who has a right or claim to the forfeited property or the proceeds derived therefrom superior to any right or claim the state has in the same property or proceeds and Detroit Street hereby makes that claim and request that all ill-gotten gains be ordered forfeited to Detroit Street, as the statute requires.

## SECOND CAUSE OF ACTION
**Colorado Organized Crime Control Act (COCCA)**
**C.R.S. 18-17-104(1) and 18-17-106**

68. All allegations previously stated herein are incorporated by reference.

69. Triad violated C.R.S. 18-17-104(1) because it knowingly received proceeds derived directly from the pattern of racketeering activity described herein.

70. Plaintiff Detroit Street is a person who has been injured by reason of Triad's participation in the quid pro quo scheme, which has artificially increased the price of the IPO shares by artificially increasing the amount of commissions that Detroit Street was and is required to generate in order to continue to obtain IPO Allocations. The scheme has also directly caused

millions of dollars' worth of IPO shares that should have been allocated to Detroit Street or other honest traders to be allocated to the Triad's trader Co-Conspirators instead.

71. Under C.R.S. 18-17-106(7), Detroit Street has a cause of action for threefold the actual damages they have sustained, attorneys' fees, and a claim to forfeited property or the proceeds derived therefrom.

72. Triad has received millions of dollars of proceeds derived from its violations of C.R.S. 18-17-104(1) which are subject to forfeiture under C.R.S. 18-17-106(10). Under C.R.S. 18-17-106(7)(b), Detroit Street is an injured person who has a right or claim to the forfeited property or the proceeds derived therefrom superior to any right or claim the state has in the same property or proceeds, and Detroit Street hereby makes that claim and requests that all ill-gotten gains be ordered forfeited to Detroit Street, as the statute requires.

## THIRD CAUSE OF ACTION
**Colorado Organized Crime Control Act (COCCA)**
**C.R.S. 18-17-104(4) and 18-17-106**

73. All allegations previously stated herein are incorporated by reference.

74. Triad violated C.R.S. 18-17-104(4) because Triad knowingly and intentionally conspired and endeavored to associate with the enterprise and to knowingly and intentionally participate in the enterprise through the ongoing pattern of racketeering activity described herein.

75. The overt acts committed by Triad and each Co-Conspirator in furtherance of the conspiracy are set forth in the paragraphs preceding the first cause of action, which paragraphs are incorporated by reference herein.

76. Plaintiff Detroit Street is a person who has been injured by reason of Triad's commission of overt acts in furtherance of the above-referenced conspiracy, Under C.R.S. 18-

17-106(7). Detroit Street has a cause of action for threefold the actual damages they have sustained, attorneys' fees, and a claim to forfeited property or the proceeds derived therefrom.

77. Triad has received millions of dollars of proceeds derived from its violations of C.R.S. 18-17-104(4) which are subject to forfeiture under C.R.S. 18-17-106(10). Under C.R.S. 18-17-106(7)(b), Detroit Street is an injured person who has a right or claim to the forfeited property or the proceeds derived therefrom superior to any right or claim the state has in the same property or proceeds, and Detroit Street hereby makes that claim and requests that all ill-gotten gains be ordered forfeited to Detroit Street, as the statute requires.

## **FOURTH CAUSE OF ACTION**
### **Civil Conspiracy**

78. All allegations previously stated herein are incorporated by reference.

79. Triad and its trader Co-Conspirators, in the course of their business, occupation, and/or vocation, agreed among themselves and conspired with each other either verbally, in writing or through their tangible overt actions, to accomplish goals through unlawful means. The goals included, without limitation, to: (a) unlawfully manipulate the established procedures by which brokerage firms would allocate the valuable right to purchase IPO Allocations, (b) unlawfully obtain the opportunity to purchase a greater number of IPO Allocations than trader Co-Conspirators would have otherwise been entitled to under brokerage firms' established policies, and (c) unlawfully deprive Detroit Street of the opportunity to purchase its legitimate portion of the IPO Allocations under brokerage firms' established rules.

80. One or more overt acts were performed to accomplish these goals. The overt acts committed by Triad in furtherance of the conspiracy are set forth in the paragraphs preceding the first cause of action.

81. As a direct and proximate result of the conspiracy alleged in this Complaint, Detroit Street has been injured as described above—including but not limited to being deprived of its fair share of IPO Allocations and being forced to pay an artificially higher price for the IPO Allocations it did receive and/or paying a premium for the inflated cost of the IPO allocated shares—in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Tortious Interference with Prospective Business Advantage**

82. All allegations previously stated herein are incorporated by reference.

83. Detroit Street had prospective business relationships with brokerage firms like J.P. Morgan, in which Detroit Street reasonably expected to receive increasing allocations of profitable IPO shares based on the trading commissions it generated through legitimate trades.

84. Triad had actual knowledge of Detroit Street's prospective business relationships with brokerage firms and its expectation of receiving IPO Allocations from those firms. As an experienced clearing broker, Triad knew that brokerage firms allocate IPO shares to customers based on trading commissions.

85. Triad intentionally and improperly interfered with Detroit Street's prospective business relationships with brokerage firms by inducing the Co-Conspirators to open fraudulent accounts and engage in sham wash trading, which Triad then cleared. The purpose of this scheme was to divert IPO shares away from legitimate customers like Detroit Street and into the hands of the Co-Conspirators.

86. Triad's conduct was wrongful because it violated FINRA rules, securities laws, and regulations, and Triad's own internal policies against facilitating wash trades. Triad acted solely out of a desire to enrich itself at the expense of legitimate investors.

87. There was a reasonable likelihood that, absent Triad's wrongful interference, Detroit Street's prospective business relationships with brokerage firms would have continued and expanded, resulting in Detroit Street receiving greater allocations of profitable IPO shares. Detroit Street had already established itself as a top-tier customer that generated substantial legitimate commissions.

88. As a direct and proximate result of Triad's tortious interference, Detroit Street suffered damages in the form of lost profits from IPO shares it would have obtained but for Triad's conduct. Detroit Street's damages are in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment

89. All allegations previously stated herein are incorporated by reference.

90. Triad received benefits in the form of fees and commissions by facilitating and participating in the IPO Market Manipulation Scheme orchestrated by Triad and its Co-Conspirators.

91. Triad appreciated and knew of the benefits it received, as it actively worked with the Co-Conspirators to perpetrate the scheme in order to collect millions of dollars in ill-gotten fees and commissions.

92. Triad accepted and retained the benefits under such circumstances as to make it inequitable for Triad to retain the benefits without payment of their value to Detroit Street.

93. Specifically, Triad enabled its Co-Conspirators to obtain IPO Allocations they were not legitimately entitled to by facilitating sham wash trades. This directly reduced the number of IPO shares available to legitimate customers like Detroit Street. Triad was unjustly enriched by the fees and commissions it collected at the expense of Detroit Street and other honest investors.

94. Equity and good conscience require Triad to disgorge and pay restitution to Detroit Street in an amount equal to the fees and commissions it unjustly obtained.

## **PRAYER FOR RELIEF**

WHEREFORE, Detroit Street respectfully prays for judgment against Triad as follows:

a. Awarding Detroit Street compensatory damages at common law against Triad in an amount to be proven at trial together with interest thereon;

b. Awarding Detroit Street treble damages pursuant to C.R.S. 18-17-106 against Triad in an amount to be proven at trial together with interest thereon;

c. Awarding Detroit Street damages pursuant to C.R.S. 18-17-106 against Triad in an amount to be proven at trial together with interest thereon equal to the total amount of all gains realized by Triad as a result of the IPO Market Manipulation Scheme;

d. Awarding Detroit Street a judgment of forfeiture pursuant to C.R.S. 18-17-106 of all property, real or personal, including without limitation, money, airplanes, boats, cars, houses, jewelry, stocks, bonds, real estate, etc., obtained by Triad using gains realized as a result of the IPO Market Manipulation Scheme or, in the alternative, a money judgment equal to the cash value of all such items;

e. Ordering disgorgement of Triad's unjust enrichment and requiring Triad to pay restitution to Detroit Street in an amount equal to the fees and commissions it unjustly obtained at Detroit Street's expense;

f. Awarding Detroit Street its reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by Detroit Street's consulting and testifying expert witnesses; and

g. Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Detroit Street respectfully demands a trial by jury on all issues so triable.

Dated: February 18, 2025

Respectfully submitted,

*/s/ Perry R. Sanders, Jr*
Perry R. Sanders, Jr.#01577
The Sanders Law Firm
31 N. Tejon, Suite 400
Colorado Springs, CO 80903
perry@perrysanders.com
Tel. 719.630.1556
Fax 719.630.7004

GLENN AGRE BERGMAN & FUENTES LLP

Andrew K. Glenn (*pro hac vice forthcoming*)
Trevor J. Welch (*pro hac vice forthcoming*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
T: 212-970-1600
aglenn@glennagre.com
twelch@glennagre.com

*Counsel for Detroit Street Partners, Inc.*

# VERIFICATION

STATE OF COLORADO }
} ss.:
COUNTY OF ARAPAHOE }

I, David Berlin, being duly sworn, deposes and says:

I am Principal Shareholder of the Plaintiff in this action. I have reviewed the contents of this complaint and verify that the statements contained herein are true to the best of my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true. I make this verification under penalties of perjury and am aware that if any of the statements contained in the foregoing pleading are willfully false, I am subject to punishment.

David Berlin

Sworn to and subscribed before me this 18 day of February 2025

Notary Public

JENNIFER J DUNN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19914014614
MY COMMISSION EXPIRES JUNE 12, 2026